## DAUPHIN DEPOSIT TRUST CO. v. UNITED STATES.
### No. 5783.

Circuit Court of Appeals, Third Circuit.
Dec. 3, 1935.

John B. Pearson, Douglass D. Storey, and Hause, Evans, Storey & Lick, all of Harrisburg, Pa., for appellant.

Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and John G. Remey, Sp. Assts. to Atty. Gen., for the United States.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

This case involves the claimed right of the government to exact a documentary tax

on certain written certificates issued by the taxpayer. The lower court upheld the government's position, whereupon the taxpayer appealed.

The facts of the case are these: The taxpayer is a chartered bank of Pennsylvania which is authorized to, and does, conduct two distinct departments—one, banking; the other, the administration of trust. The funds of each are kept separate. In the course of its business, the banking department takes mortgages, which pay 6 per cent. interest, from individuals, upon their real estate and holds the same for temporary investment. In conducting its business, the trust department comes in contact with persons who desire to invest in individual mortgages. Thereupon, the trust department takes the money of the customer, say, for example, $500, and with such money buys from the banking department a $500 individual mortgage. Instead of delivering the mortgage to the customer, the trust department gives the customer a certificate of mortgage ownership of the entire amount of the mortgage and an agreement that when and if the 6 per cent. interest is paid by the individual mortgagor, the trust company will pay 5½ per cent. thereof to the customer. By this arrangement, the customer becomes the owner of the $500 mortgage principal and, when paid, gets 5½ per cent. interest on said principal and the trust company retains one-half of 1 per cent. interest for its services. The transaction is evidenced by the writing following:

"Certificate of Participation
"No. 6000
"December 1, 1930

"This is to certify, that the following described mortgage:

"Mortgagor               John Doe
"For                     $5,000.00

"Dated August 1, 1930 Payable August 1, 1931

"Interest Payable February 1 and August 1

"Recorded (Recording data here inserted)

"Property (Description of property here inserted)

"Although standing in the name of Dauphin Deposit Trust Company, Harrisburg, Pa., is not entirely the property of the Company, but that Five Hundred ...... Dollars of the mortgage is held by the Company, in trust for Richard Roe and that as the interest is paid to us, we will remit 5½% on this amount from December 1, 1930.

"Dauphin Deposit Trust Company does not agree to repurchase this Certificate except upon payment of the principal of the mortgage.

"Dauphin Deposit Trust Company
"By (Signature)
"Trust Officer
"$500.00          (Signature)
"Vice President
"Asst. Treasurer."

It will be noted that the transaction is what may be called an individual, personal transaction, in that the customer selects the particular mortgage he wishes to buy and sometimes visits and inspects the property before he buys the mortgage. He pools his purchase with no one. In this regard the proof is:

"Q. Now, these mortgages which you took from your customers in loaning money, were they the usual straight Pennsylvania mortgages which accompanied a bond? A. Yes, they were. A single bond.

"Q. Just the usual single bond for the amount of the loan accompanied by the Pennsylvania standard form of mortgage securing that loan? A. Yes.

"Q. Were these certificates of participation issued against particular mortgages or were they issued against the so-called pool of mortgages? A. They were issued against particular mortgages in every case.

"Q. During the period from 1927 to and including 1931 in particular, being the tax period involved, did your company have any mortgage pool? A. We have never had any mortgage pool.

"Q. Just describe how these certificates of participation were handled after you had given a loan and taken the bond and mortgage? A. You mean as to the internal handling?

"Q. As to the customer's purchase and how to handle it. A. We frequently have customers who wish to invest in mortgages and rather than take the mortgage direct, which would involve the looking after the details, collecting the interest and that sort of thing, they would ask us to invest the money for them in mortgages, and the method of doing that is to sell them a portion of a mortgage which we had previously taken from a borrower. Then we would issue our certificate of participation as evidence of that sale of part of a mortgage.

"Q. Were these mortgages which you had taken from the borrowers usually from individuals or usually from corporations? A. A few were from corporations but the great majority were from individual borrowers.

"Q. Now, when a purchaser came in to invest in mortgages, would you tell them the premises and the amount, and would they make any investigation of the premises? A. We always told them the property the mortgage was on and in some cases the customers would actually go out and inspect the premises before purchasing the participation, but in other cases they would rely on the judgment of the trust company and not make a personal inspection."

It is clear that the business was a local practice of the trust company and its customers.

The further proof is that the certificates were not assignable, were never listed, and were never known as or called, corporate securities. In that regard the proof is:

"Q. Now, Mr. Keister, I note that these certificates are not expressly made assignable. That is true, is it not? A. Yes.

"Q. Now, Mr. Keister, were these mortgage participation certificates ever listed, to your knowledge, in any exchange or place for the sale or transfer of them in Harrisburg? A. No.

"Q. During your connection with Dauphin Deposit Trust Company you have bought a great many so-called corporate securities for the bank, as well as for the bank's customers? A. Yes.

"Q. Have you ever heard of these mortgage participation certificates being generally referred to as corporate securities? A. No.

"Q. To your knowledge, are they generally known as corporate securities? A. I think not. I never heard them referred to in that way at all. As a matter of fact, the holders usually consider, if not always, that they are the owners of a mortgage and of course that is what they really are.

"Q. Were some of these certificates of participation issued against the entire mortgage. In other words, was the certificate for 100 per cent. of the mortgage? A. Yes, frequently.

"Q. Mr. Keister, I notice that these certificates of participation are numbered. Were they always numbered? A. When the trust company first started to issue these certificates, they were issued in substantially the same form as now but were simply typewritten on a letterhead without any number. As the volume increased, both for our own convenience and at the request of the Pennsylvania Banking Department, the certificates were numbered for the purpose of obtaining a better control of the total number and amount of such certificates outstanding."

As to the restricted, nonassignable character of the transaction, the further proof is:

"Q. When these certificates reach maturity, do you make payment of the interest and the principal on the due date? A. Interest is paid only when actually collected and the principal is paid only when actually collected.

"Q. During the period in question, did you have any certificates returned to you at maturity assigned to another person or persons other than those to whom the certificate was originally issued? A. That is difficult to answer positively. There never were general assignments made from one holder to another, but in a few instances a holder would come into the trust company and ask us to transfer his certificate to another holder. Such transfers were almost always in the distribution of an estate which was the former holder.

"Q. In those cases where a transfer was made, would you make a note of the transfer on your records in the trust department? A. The old certificate would be cancelled and a new certificate issued to the new holder and a new account opened on our books as trustee for the new holder.
* * *

"Q. Now, then, if a holder of a participation certificate would come to your bank and ask that it be assigned to a third person, would your bank consent to that assignment? A. We never have consented to the assignment of a particular certificate. However, we will accept the outstanding certificate for cancellation and issue a new certificate to the new holder.

"Q. Did you ever issue any of the participation certificates against a group of mortgages? A. No."

■ From the above proofs—and the government offered no proof to the contrary—it is clear that the transaction was an assignment, without recourse, of a mortgage and its accompanying bond, of the principal and a part of the interest, when and if paid, and falls within Treasury Reg-

ulation 71, Article 17, which provides, "an instrument which merely represents an assignment of interest in a bond accompanying a mortgage is not taxable." But the court below took the certificate, which the proofs and certificate show was an assignment of a mortgage accompanying a bond, from such classification and held it was covered by taxing statute which imposes a tax "on all bonds, debentures, or certificates of indebtedness issued by any corporation, and all instruments, however termed, issued by any corporation with interest coupons or in registered form, known generally as corporate securities, on each of $100 of face value or fraction thereof, 5 cents" (26 U.S.C.A. § 901 (1), and basing such action on the ground that "an analogous situation to the case at bar was before the United States Supreme Court in Lederer v. Fidelity Trust Co., 267 U.S. 17, 45 S.Ct. 206, 207, 69 L.Ed. 494." 9 F.Supp. 257, 258. On the contrary, we do not regard the Lederer Case as analogous to the present case. It is fundamental that each tax case turns on its own particular facts and, viewing the Lederer and the present case on their own facts, we find the facts were pertinently different in the two cases. In the former case, we have a banking group which owned hundreds of cars, selling them to a trust company, which, by bailment, leased them to a railroad which agreed to pay a stipulated rental therefor, and the payment of such rental was guaranteed by a second railroad. For the payment of the rental price to the bankers, the trust company delivered to them certificates payable to bearer, which certificates were payable to bearer, had attached to them dividend warrants, had stamped on them the guarantee of the other railroad, and which provided for their registration. The purpose of the transaction is a means of selling to the public these certificates with the dividend warrants, just as corporate bonds were sold. The transaction involved the security of three corporations: First, the lessee corporation was bound to pay the dividend warrants; second, the other railroad guaranteed payment of such rental; third, the trust company agreed that if and when the rental was paid, it would pay the dividend warrants to the holders of the certificates. Of that situation the Supreme Court said: "The essential features are that the bearer or registered holder is entitled to one share of $1,000 in Interstate Railroad Equipment Trust, Series 'C,' in accordance with

the above agreement, referred to; that the principal shall be payable at the dates of the payments by the railroad, one-tenth of the certificates, identified by number, each year, and in the meantime dividends will be payable as evidenced by dividend warrants attached, principal and interest payable in gold, etc., 'but only from and out of the deferred rentals when paid as provided in' the lease referred to. * * * As a matter of common speech, to which the statute refers, we have no doubt that these instruments would be known as corporate securities."

Dealing with three corporate parties, each taking part in this certificate, we have a different situation in the facts, proofs, and relations of the present case. In it we have an individual giving a bond and mortgage, an individual buying that mortgage, and the issuance of a certificate evidencing the purchasing and ownership of the individual buying the same. The certificate has not the "interest coupons," nor is it "in registered form" as specified by the statute. It was not, and could not from its nature be, sold in security exchanges and, being of this local, individual character, it never did or never could be known as a corporate security. The taxpayer's proof of this latter fact is positive, and in the absence of any contradicting proof by the government, we are constrained to hold that the certificate which evidenced the purchase by an individual buyer of an individual debt was neither in name, fact, nor the mind of Congress subjected to tax when it used the statutory requirement of having "interest coupons," "in registered form," or being "known generally as corporate securities." It being shown that these mortgage purchases were in general use, that in the absence of such general use there was no opportunity for them to have been given any particular name, it follows that as a fact they could not in the nature of things and were not "generally known as corporate securities," and the uncontradicted proof that these certificates of mortgage ownership never did acquire, and never could have, such a meaning either now or when this statute was enacted—and in these days of universal and increasing taxation courts should not lose sight of the hitherto settled policy of the law to adjudge ambiguity or uncertainty in the taxing statute as relieving the taxpayer—the judgment below is reversed and the record remanded with directions to enter a judgment n. o. v. (see Baltimore & Carolina Line, Inc. v.

Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636, opinion filed June 3, 1935) in favor of the plaintiff for the admitted amount of plaintiff's claim with interest from date the same was paid.